## The People ex rel. Edmund Heather and David W. Allison v. Benjamin D. Pritchard, Commissioner of State Land Office.

*Swamp Lands: Contractors: Selection.* Under the act of 1859, p. *310;* providing that contractors for the building of roads might elect to take swamp lands in lieu of money in liquidation of their contract, etc., *held,* that they were not entitled to select lands which were not subject to entry at private sale.

The purpose of the legislature was to make no distinction between contractors and other persons as · to the value of the consideration to be received by the State for the lands. And it was never intended that such contractors should have the right to select at pleasure from the body of lands not placed in market, and from which all the other persons had been excluded from purchasing.

*Heard July 7th. Decided July 13th.*

*Mandamus.*

This was an application to compel the Auditor General to execute deeds for certain swamp lands.

It was based upon the following petition :

" Your petitioners, Edmund Heather and David W. Allison, of the County of Saginaw, in the State of Michigan, respectfully represent:

That by virtue of an act of .the Congress of the United States, approved the 28th day of September, 1860, entitled " An Act to enable the State of Arkansas and other states to reclaim the 'Swamp Lands' within their limits," there was granted to the State of Michigan, amongst others, the following lands, in the lower peninsula of said state, the northwest quarter, and the southwest quarter of the southeast quarter of section thirteen, and the southeast quarter of northeast quarter of· section fourteen, and the west half of northwest quarter of section twenty-one, in town twenty-five north, range seven west, containing in all 320 acres; and which lands were afterwards duly conveyed to the State of Michigan, prior to the 20th day of December, 1866, and known as swamp lands.

That on the 18th day of August, 1865, one Ira Amsbury entered into a certain contract to construct section

eight, part of a certain road, called the Saginaw, Gratiot and Newaygo road, which part so to be constructed commenced at section stake number seven, and ending at stake number eight, according to the specification contained in said contract.

That said contract was duly signed and executed by said Amsbury, on his part, and by a local commissioner of said road, duly appointed and authorized for that purpose, and on the 20th day of December, 1866, was duly approved in writing endorsed thereon by the Governor of the State of Michigan.

That in and by said contract the said local commissioner bound himself officially to certify to the completion of the said road, when so completed, and to cause to be issued to the said Amsbury, by the Commissioner of the State Land Office of the State of Michigan, certificates for 320 acres of land, to be selected by the said Amsbury from any of the swamp lands in the State of Michigan, in the lower peninsula, applicable to the construction of said road, according to the rules and regulations in force in the office of said Commissioner of the State Land Office.

That afterwards the said Amsbury did proceed to construct, and did complete the section of said road referred to in said contract, and, in all respects, perform said contract, in every particular thereof, on his part to be performed; and afterwards, on the 28th day of November, A. D. 1867, the Swamp Land Road Commissioner of said state having certified and reported that said contract had been completed in good faith, and said contract fully performed, the same was duly approved by the Board of Control of the State of Michigan, and a warrant issued by the Auditor General for the payment thereof, and all things done and acts performed on the part of said Amsbury, which entitled him or his assigns to payment for the construction of said road.

Your petitioners also state, on the 27th day of April, 1867, the said Ira Amsbury, by his certain writing, duly

acknowledged and delivered to your petitioner, did sell, assign and transfer unto your petitioner, by the name and style of Heather and Allison, all his right, title, interest and claim to the 320 acres of state swamp land called for in his contract above set forth, the original of which assignment was duly acknowledged and filed with the Commissioner of the State Land Office of the State of Michigan, in his office at Lansing.

That on the 27th day of May, 1868, your petitioners in writing applied to the Hon. Benjamin D. Pritchard, who then was, and now is, Commissioner of the State Land Office of the State of Michigan, for certificates of purchase of the lands herein described, in payment for the construction of said road. That such lands were known as swamp lands, and no person had any possession, right, title or claim thereto, other than the State of Michigan and your petitioners, and they were, as your petitioners submit, subject to be, and were selected for the purpose of payment of the labor performed under said contract.

That said Commissioner refused to so issue any patent, certificate or conveyance for said lands, to your petitioners, and answered that said lands were not in market and subject to private entry, having never been offered at public sale or auction, or brought into market in accordance with the provision of law, and therefore patents could not be issued for the same; not denying, and he does not deny the right of your petitioners to such lands, if they are liable to be so selected, and are subject to be conveyed in payment as aforesaid.

Your petitioners therefore pray that a writ of *mandamus* may issue, directed to the said Benjamin D. Pritchard, as Commissioner of the State Land Office for the State of Michigan, commanding him to issue, under the seal of his office, a proper certificate of purchase, patent, or conveyance, in due form of law, of the premises above described, and deliver the same to your petitioners, that they may have

the same in payment of the contract price for the construction, by said Amsbury, of said section of said road; and that your petitioners may have such further or other relief as they above show themselves entitled."

*D. Darwin Hughes, D. C. Holbrook* and *J. W. Longyear,* for relator.

1. The grant of swamp lands by Congress provided two methods of applying the lands to the object of the grant.

*First,* By sale;

*Second,* By application of the lands in kind.

2. The legislature have provided both methods of disposition of the land; under the first, the lands must be offered at auction, but under the second, the lands are applied directly to the accomplishment of the purposes of the grant. *Laws of 1862, p. 56, and the acts which it amends; Laws 1864, p. 90.*

*a.* The acts taken together form one system, and must be construed together.

*b.* They must receive this construction, because, on their face, such is the natural import of the language used.

*c.* There is nothing in the subject matter of the acts, or any extrinsic fact, which makes it necessary to adopt any other than the natural construction of the language.

d. The same competition exists in one construction as the other.

*e.* The lands are to be selected at their minimum price. There is no minimum price to lands which have been made subject to private sale, by offering at auction.

*Wm. L. Stoughton,* Attorney General, and *A. B. Maynard,* for respondents.

The State Land Office is established, and the powers and duties of the Commissioner defined by statutes.— *Comp. L. p. 770.*

The lands known as state swamp lands were granted to this state by Act of Congress of September 28th, 1850. — *9 U. S. Stat. at large, 519.*

The disposition of these lands is a proper subject matter for legislative discretion and judgment, and can not be inquired into in this proceeding. It is a question of state policy which courts can not remedy even if wrong. — *Sedgw. on Stat. and Const. Law, 308.*

The acts of the legislature of this state of 1851, p. 322 *1 C. L. 799* — of 1857, p. 234, and of 1858, p. 169, contemplate the sale of these lands, and each act contains a provision that the lands shall be offered at public sale before they were subject to private entry. In 1859, the system of draining these lands by means of state roads and ditches was adopted. — *S. L. 1859, 310; Id. 1861, 137; Id. 1862, 56.*

But the provisions for the sale of lands were clearly recognized and continued. — *S. L. 1859, 266; Id. 1861, 139; Id, 1862, 56.*

Section 5 of the act of 1859, p. 314, as amended by *S. L. of 1861, p. 139,* and *1862, p. 56,* appropriates the proceeds of the sale of these lands to the payment of the construction of roads and bridges, and also provides that the contractors may select lands at the minimum price in lieu of money.

The question now arises, what lands were the contractors authorized to select?

We claim that they could only select such lands as were subject to entry at private sale. When these acts were passed the swamp lands were required to be first offered at public sale. — *1 C. L. 799; S. L. 1858, 170.*

These acts are in full force. It can not be said that they are repealed by implication. — *Sedgw. on Stat. and Const. Law, 123.*

They can be harmonized and made consistent, and evidently express the intention of the legislature, and therefore must stand. — *2 Mich. 139.*

The contract set forth in the petition does not comply with the provisions of section 8 of the Act of 1861, p. 141.

The letting of the contract is not a public sale of the land.— *S. L. 1863, 380.*

GRAVES J.

The only question raised, by the return to the writ in this case, is whether the contract mentioned therein, for constructing a portion of the Saginaw, Gratiot and Newago State Road, entitled the contractors, or their assignees, to select any swamp lands, to be received in payment, which were not subject to entry at private sale. It is maintained, on the part of the respondent, that the selection of any such lands, not subject to private entry, was unauthorized, while, on the other hand, the relators contend that any swamp lands of the state, in the lower peninsula, were subject to selection, whether they had been offered at public auction or not.

The view entertained by the respondent would result in substituting for the cash price of the contract an equivalent in value from the lands in market; while the ground taken by the relators would give to the contractors or their assignees the same quantity of land not purchasable by others, and greatly exceeding in value the money standard of the contract.

In order to determine which of these opinions is correct, it is only necessary to recur to the contract in question and to some of the legislation respecting the swamp lands.

The contract referred to, was made in 1866, and the Act for the construction of the road was passed in 1864. *Sess. L. p. 90.* The first section provides for the establishment of the road, and the second and third sections are as follows:

"SEC. 2. Said road to be laid out and constructed under the provisions of *Act 117, Sess. L. 1859. Approved February 12, 1859,* and the Acts amendatory thereto.

17 MICH. — s.

SEC. 3. To secure the construction of said road, there is hereby appropriated an average of 640 acres of state swamp land to the mile, to be expended under the provisions of said Act, and the Acts amendatory thereto."

It is evident that this act is but a supplement to the law of 1859, as amended, and that the appropriation which it makes, must be governed by the provisions of that law, and be subject to the same modifications and restrictions to which the terms of that law are subject. The Act of 1859 — *Sess. L. 1859, p. 310* — as finally amended in 1862 — *Sess. L. 1862, p. 56* — appropriated, of the money to accrue upon the sale of swamp land, an average amount per mile on each road, not exceeding the value of six hundred and forty acres of said lands, at the minimum price fixed by the laws of this state, and provided that any contractor for the construction of any such road, or any part thereof, might elect to take lands in lieu of money, in liquidation of such contract, or any portion thereof, equal to the contract price for the construction of two miles, or in payment of existing cash contracts, then accepted and approved, and that no more than an average of six hundred and forty acres of said lands should be stipulated to be paid per mile for any road.

It is seen that the law just mentioned refers to another law fixing the minimum price of these swamp lands.

The former law is, by the nature and subject of this reference, closely connected with the latter. The law thus referred to is found in sections one and two of the Act of 1858 — *Sess. L. 1858, p. 169* — the other portions of the act having been repealed. These sections which remain in full force are as follows:

" SEC. 1. That the swamp lands granted to said state by Act of Congress, approved September 28, 1850, shall continue under the supervision of the Commissioner of the State Land Office, and subject to sale by him, as hereinafter provided; but none of said lands shall be offered for sale prior to the issue of patents to the State therefor.

SEC. 2. Said lands shall first be offered at public sale, by auction, but shall not be sold at a less price than $1.25 per acre, which shall be the minimum price therefor, and shall be subject to entry at private sale, at such minimum price, after being offered at public auction, as in this act provided, and such lands shall be sold at public and private sale, in the smallest legal subdivisons, required by purchasers."

It is seen, therefore, that when provision was made for a cash expenditure of an average amount per mile, not exceeding the value of six hundred and forty acres, at the minimum price fixed by the laws of this state, the sum, until the minimum price should be changed, would be an average of eight hundred dollars per mile; and that the choice between money and land, given to the contractor by the Act of 1859, as amended, was a choice between an average of eight hundred dollars per mile, or lands in lieu of it.

It is worthy of observation that this provision implies freedom of choice between land and money on the part of the contractor, and an indifference on the part of the state as to whether the one should be taken rather than the other. Such could hardly have been the case, except upon the supposition that the land and money would be equivalents in the consideration of the state. The lands were also to be in liquidation of subsequent contracts, or in payment of cash contracts then existing. This difference in phraseology is easily explained. As to cash contracts already made, a money liability was supposed to have been incurred to be discharged by payment, while the contractors, under subsequent contracts, would be entitled to select their lands on approval of their bonds and contracts by the Governor, but would not have them in payment until performance. The effect of the final disposition of the lands would be the same in both cases.

The transfer upon the agreed consideration would surely be a sale.

We have seen that, by the second section of the Act of 1858, the land could not be in market until offered at public sale. The Act of 1859, as amended by the Act of 1862, provides that lands selected by contractors shall be withheld from market during the full time specified in the contract for the completion thereof. This language clearly implies that but for such provision the land open to selection would be in market, and as none could be so unless offered at public sale, the inference is very strong that no lands not in market were intended for selection.

It is urged on the part of the relators that the express authority to contractors to select land anywhere in the state, is a plain declaration that any lands may be taken. This position is deemed to be clearly untenable. The phrase itself would be extremely inapt to express that meaning; and it is well known, indeed, to have been a simple amendment of former provisions, which obliged the contractor to select his lands in the county in which the work was done. Such was the Act of 1859. It had no relation to the question as to whether lands not in market could be selected. The purpose was to define the territory in which a particular contractor could select lands subject to selection. The Act of March 7, 1861, was the last which required that the lands should be selected in the county, and in reference thereto, the Act of 1862 provides that in all those contracts made prior to March 7, 1861, when the party contracted to take lands, the same must be selected in those counties where the work was performed. The Act of 1862 also distinguishes the upper from the lower peninsula, as to the right to select lands. It seems too plain to admit of argument, that this provision has no bearing upon the question as to whether lands which have never been offered for sale may be taken by contractors in lieu of money.

These statutes relating to swamp lands are not to be considered separately as isolated and independent enactments. They all bear upon the same subject, and are to

be construed together as one system, and as explanatory of each other.

When thus considered, it seems evident that the purpose of the legislature was to make no distinction between contractors and other persons, as to the value of the consideration to be received by the State for the lands. And it seems equally clear, that it was never intended that such contractors should have the right to select at pleasure from the body of lands not placed in market, and from which all other persons had been excluded from purchasing.

The course contended for on the part of the relators would produce the utmost confusion in the accounts with these lands in the offices of the Auditor General and State Treasurer, and would lead to results which could not have been contemplated, and which can not be defended. The argument by which the position of the relators is sustained would, if carried out, completely subject to the disposal of contractors all mineral and other lands of the greatest value covered by the congressional swamp grant, notwithstanding their careful reservation from market by the state.

Before acceding to a proposition leading to such consequences, the case should be well supported and clear.

That is not the case in this instance. The position taken on the part of the relators finds support neither in the general policy of the state respecting the swamp lands, nor in the spirit of the very legislation on which the position is based. On the other hand, the view taken by the respondent accords with such policy, is reasonable and just in itself, and appears to be justified by a sound interpretation of the laws bearing upon the question.

I think that the writ prayed for should be refused with costs.

The other Justices concurred.